IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Cory A. Reeves, | : | |
| | : | Case No. 1:16-cv-765 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting Motions |
| Shawnee State University, *et al.*, | : | for Summary Judgment |
| | : | |
| Defendants. | : | |

This matter is before the Court on the Motion for Summary Judgment (Doc. 34) filed by

Defendants Shawnee State University ("the University"), Leeann Denning, and Crystal Sherman

(collectively, "the Shawnee State Defendants") and the Motion for Summary Judgment (Doc. 35)

filed by Defendants Southern Ohio Medical Center ("SOMC" or "the Medical Center"), Frankie

(Benson) Saunders, and Josie Wright (collectively, "the SOMC Defendants").  Plaintiff Cory A.

Reeves was a nursing student at the University who participated in a clinical internship at the

Medical Center.  Reeves alleges in this suit that he was discriminated against on the basis of his

race by both faculty members at the University and nursing supervisors at the Medical Center

resulting in his dismissal from the nursing program just prior to his anticipated graduation.  For

the reasons that follow, the Court will **GRANT** the Motions for Summary Judgment.

## I.       BACKGROUND

### A.       Factual History

The following facts are derived from the Shawnee State Defendants' Proposed

Undisputed Facts (Doc. 34-1), the SOMC Defendants' Statement of Proposed Undisputed Facts

(Doc. 35-8), and Plaintiff's Responses to both (Docs. 40 and 41-1), unless specifically noted

otherwise.

### 1. The Parties

Plaintiff Cory Reeves is a black person and a resident of Portsmouth, Ohio. The University, located in Portsmouth, Ohio, is a public state university pursuant to Ohio Revised Code Chapter 3362. It offers an associate's degree in nursing. Dr. Leeann Denning and Dr. Crystal Sherman, both white, are employed by University in the Department of Nursing. The Medical Center is a not-for-profit hospital in Portsmouth, Ohio that provides emergency and surgical care, plus other health services. Nurse Frankie Saunders and Nurse Josie Wright, both white, are registered nurses employed by the Medical Center. Both volunteered as nursing internship supervisors, called preceptors, for University nursing students during their clinical internships, called preceptorships, at the Medical Center.

### 2. Reeves's Experiences as a Nursing Student at the University

#### a. Levels 1 through 3

Reeves enrolled as a student at the University in the spring of 2009. He applied to enroll in the Associate's Degree in Nursing Program ("Nursing Program" or "ADN Program") in 2013 to begin classes in the Spring 2014 semester. The Nursing Program is a two-year program broken into four semesters referred to as Levels 1 through 4. As part of his application process, Reeves agreed to the following responsibilities if accepted into the Nursing Program:

I understand that if admitted to the Nursing program, I will be responsible for:

1. Caring for clients of all ages, ethnic, and social backgrounds.

2. Traveling to a clinical site up to 50–60 miles away from campus and arriving by 7:00 a.m.

3. Securing a reliable source of transportation.

4. Devoting up to 12 hours a day to my education, including reading, group study, and clinical preparation.

5. Spending up to 20–30 hours a week in the classroom, lab, or hospital setting.

6. Scheduling time off work 24 hours prior to an assigned clinical time during the obstetrical rotation.

(Doc. 32-1 at PageID 412.)

Students in the Nursing Program were required to maintain a "C" grade or better for all courses. In order to receive a "C" grade or better, students had to perform satisfactorily in clinical areas:

> Performance in clinical areas must be satisfactory. A student may receive an unsatisfactory for a variety of reasons such as jeopardizing patient safety, unethical conduct, failure to attend labs, or failure to make up an excused clinical absence, etc. If a student receives an unsatisfactory grade for the clinical component, the student will receive a course grade of "F" regardless of the theory grade.

(Doc. 32-1 at PageID 554.)

Reeves was admitted to and enrolled in the Nursing Program for the Spring 2014 semester. Reeves received a failing grade in the Level 1 Fundamentals of Nursing course in the Spring 2014 semester, and he was dismissed from the Nursing Program as a result. The Readmission Policy for the Nursing Program set forth in the Nursing Student Handbook stated that the students dismissed from the program could apply for readmission into the program one time. (Doc. 32-1 at PageID 581; Reeves Dep. Vol. 1, Doc. 32 at PageID 328.)[1] Reeves applied for and was granted readmission to the Nursing Program during the Fall 2014 semester.

In the Spring 2015 semester, Reeves enrolled in the ADNR 1194 course, the primary nursing Level 2 course, taught by Professor Margaret Selby. Reeves accused Professor Selby of "nonproductive, inappropriate, and unprofessional" conduct in the classroom. Defendant Dr. Denning, then the Interim Administrative Chair of the Nursing Department, intervened on Reeves's behalf regarding clinical sessions he had missed for Professor Selby's class. Professor

---

[1] Reeves denies that students could only be readmitted to the Nursing Program one time per the written policy, but evidence he points to does not support his position, nor even address the topic of the readmission of students. (Doc. 40 at PageID 1569; Doc. 41-1 at PageID 1602.)

Selby allowed Reeves to make up the clinical sessions after that intervention. Reeves also shared with Dr. Denning a letter he intended to send to Professor Selby in which he criticized her for directing "degrading comments, sarcasm, [and] anger" to him in response to his questions in the classroom. (Doc. 32-1 at PageID 592.) Dr. Denning responded that Reeves should "[m]ove forward with confidence and clarity of purpose" and stated that his letter was "well written and heartfelt." (*Id.* at PageID 591.) Reeves did not mention race discrimination in the letter. (*Id.* at PageID 592–93.) However, Reeves argues now that "it was clear that [he] was claiming to have been mistreated because of [his] race" because he was the only black student in his nursing class. (Reeves Aff., Doc. 39-1 at PageID 1482.)[2] Reeves agrees that Dr. Denning adequately provided support to him in regards to Professor Selby. He received a "B" grade from Professor Selby for that course.

During the Fall 2015 semester, Reeves enrolled in the ADNR 2253 course, the primary nursing Level 3 course, taught by Professor Theresa Jackson, a non-party who filed an Affidavit supporting Reeves in this case. Reeves was informed by Professor Jackson at the time of the mid-term that he was in danger of failing the course. Professor Jackson required Reeves to remediate his intravenous ("IV") skills by practicing additional hours in the University nursing lab with Loretta Cooper, Nursing Lab Coordinator. Reeves admitted he needed remedial work with properly inserting IV lines. Dr. Denning worked with Reeves individually during the course of his remediation. Cooper informed Professor Jackson that even with extra practice in the lab inserting IVs, Reeves "needed to be more organized and timely and get the steps in a methodical order," and that his "confidence [was] lacking." (Doc. 32-1 at PageID 494.) About a week later, after Reeves had a second practice session on IVs, Cooper expressed concern about

---

[2] Reeves does not provide any data from the University about the demographic make-up of the students in the Nursing Program.

Reeves's ability to perform this basic nursing skill: "By the end of his multiple attempts, re-directions and demos, he had improved and showed proficiency to me on his own. . . . Now, whether that goes with him and continues to be able [sic] will be determined. . . ." (*Id.*) Ultimately, Reeves improved his course grade enough to pass Level 3 and move to Level 4 in the Nursing Program in the Spring 2016 semester.

### b.     Level 4, Preceptorship, and Dismissal from Nursing Program

In the Spring 2016 semester, Reeves took the Level 4 ADNR 2284 course which involved a mix of classroom lectures, lab work, and a preceptorship. The ANDR 2284 course was administered by Defendant Dr. Sherman, then the Faculty Coordinator and currently a professor in the Nursing Program. Reeves received testing accommodations while in the Nursing Program, including in the ANDR 2284 course. His accommodations included taking tests in a quiet and uninterrupted environment at the Student Success Center. (Reeves Dep. Vol. II, Doc. 33 at PageID 725.) These tests included unit examinations and "HESI" tests provided through the Health Education Systems, Inc.

For at least one HESI examination in the ADNR 2284 course, Reeves experienced a problem in the Student Success Center and could not open the test. Dr. Sherman required Reeves to take the test in a room near a copy machine, but he was disturbed by students going in and out using the copy machine. (Reeves Dep., Doc. 32 at PageID 365–68.) Reeves brought his concern about the testing environment to Dr. Denning, but he did not allege that he was being subjected to racial discrimination. (Denning Aff., Doc. 34-3 at PageID 1177.) Dr. Denning took steps to ensure that the HESI software was properly installed on the Student Success Center's computers and told Reeves the issue had been resolved. (Doc. 32-1 at PageID 649.)

Reeves complains that he was treated unfairly during his preceptorship for the ADNR 2284 course. Completion of the 120-hour preceptorship was required to receive an associate's degree in nursing and was regulated by the Ohio Board of Nursing under Ohio Administrative Code § 4723-5-01, *et seq.* Students in the ADNR 2284 course had the option to complete their preceptorship hours at one of three hospitals: Defendant Southern Ohio Medical Center, King's Daughters Medical Center, and Our Lady of Bellefonte Hospital. The hospitals provided a list of available preceptors to Dr. Sherman, who made the student/preceptor assignments. Students could request a specific hospital or preceptor, but Dr. Sherman could not grant all requests.

Dr. Sherman informed the students via an email to the class that she would use a ranking system based on student quiz scores to make her placement decisions. (*Id.* at 471–72.) She stated that students who received a "100" on a dosage calculation quiz would get "first choice of a preceptor at SOMC or [King's Daughter Medical Center]" and that students who receive a "90" would get their "second choice." (*Id.*) Students who received lower than a "90" would not be assigned a preceptor until they passed the test. (*Id.*) Dr. Sherman also told the students that she could not always grant students' requests for specific preceptors. Finally, she warned the students about the potential difficulties of late-semester preceptorships:

> In addition, the student needs to be aware that honoring his/her request for a specific site may mean that the student cannot start precepting until later in the semester. Starting later in the semester may mean that the student may have difficulty fitting in all of the required hours. For this reason, I encourage all of you to be flexible and do not box yourself into a corner. The best approach is to get a preceptor as early as possible and complete your hours as early in the semester as possible. Preceptors do sometimes take vacations, become ill, or take days off for low census. Therefore, you want to have time in the semester to accommodate these unforeseen circumstances. It is never a good policy to wait until the last minute for anything, and that certainly applies with precepting.

(*Id.*)

Reeves testified at his deposition that he did not specifically recall receiving the email, but he conceded that it appeared to be sent to the class and that he might have received it. (Doc. 32 at 275–76.) Reeves received a "90" on the dosage calculation quiz, and he was assigned to the second group for preceptorships. (*Id.* at PageID 381; Reeves Aff., Doc. 39-1 at PageID 1471.) Neither Reeves nor the Defendants point to any evidence regarding whether any students had to retake the dosage calculation quiz and should have been assigned preceptorships after Reeves.

Reeves's preference was to complete the preceptorship at SOMC. On January 21, 2016, Dr. Sherman sent Reeves and several other students an email asking for two volunteers for open preceptorships at King's Daughters Medical Center in Kentucky during the first half of the semester. (Doc. 32-1 at PageID 636.) Reeves testified at his deposition that he did not think he was eligible to volunteer despite receiving the email because he had been told that he would do his internship in the second half of the semester. (Doc. 32 at PageID 379–80.)[3] Reeves also received an email dated March 22, 2016, from Dr. Sherman stating that she had a preceptorship available at King's Daughters Medical Center. (*Id.* at 382–83; Doc. 32-1 at PageID 638.)

On March 24, 2016, Dr. Sherman informed Reeves that had assigned Defendant Nurse Wright, an SOMC employee, as his preceptor for a preceptorship at SOMC. Professor Jackson was his clinical instructor for the preceptorship. Two white nursing students in ADNR 2284 began their preceptorships around the same time. (Sherman Aff., Doc. 34-2 at PageID 1174.) Reeves began working with Nurse Wright at the Medical Center on March 30, 2016. The preceptorship was set to run for approximately four weeks until April 30, 2016. Nurse Wright

---

[3] In his later-sworn Affidavit, Reeves specifically denied receiving the email and denied knowing he could have done his preceptorship at King's Daughters Medical Center in Kentucky. (Reeves Aff., Doc. 39-1 at PageID 1474–75.) However, Reeves cannot create a factual issue of dispute after a motion for summary judgment has been filed by filing an affidavit which contradicts earlier deposition testimony. *See Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)

informed Reeves on the first day of his preceptorship that she was taking a vacation the following week.  Reeves worked with Nurse Wright as his preceptor up to and including April 8, 2016 for a total of forty-two hours.  Nurse Wright was not able to serve as a preceptor during one of Reeves's scheduled shifts that week because she was assigned to be the charge nurse.  Reeves worked with a different nurse on that day, but the hours did not count towards his required preceptorship hours based on the rules set forth by the Ohio Board of Nursing and the University's preceptorship policy.

Nurse Wright completed a Student Clinical Practice Evaluation form for Reeves.  She stated that he "need[ed] much improvement with time management skills" and "need[ed] reinforcement each time" he took a patient's vital signs.  (Doc. 32-1 at PageID 479–80.)  She concluded that Reeves "[c]onstantly needed reminders and reinforcements for basic tasks" and that "[m]uch improvement [was] needed to ensure patient safety."  (*Id.* at PageID 482.)  The Student Clinical Practice Evaluation form is not dated, but it appears to have been received on April 27, 2016.  Reeves asserts that Nurse Wright did not tell him during his preceptorship that he was "doing anything wrong."  (Reeves Aff., Doc. 39-1 at PageID 1475.)

Nurse Saunders agreed to serve as Reeves's substitute preceptor on April 11, 2016 with the preceptorship scheduled to resume the next week, last approximately three weeks, and end between May 2 and May 10, 2016.  (Doc. 32-1 at PageID 641.)  This would have resulted in the preceptorship extending beyond the final days of the Spring 2016 Semester.  (Denning Aff., Doc. 34-3 at PageID 1177.)  Another nursing student, identified in this lawsuit as Student H, also was given an extended period of time after the graduation date for the Spring 2016 semester to finish his preceptorship.  (*Id.*)

Reeves was told that he could not start with Nurse Saunders before April 19, 2016 because she had to finish up her preceptor duties with another nursing student. Dr. Sherman enforced a one preceptor-one nursing student policy during preceptorships, although the University's Department of Nursing Preceptor Policy stated that a preceptor could supervise up to two students. (Doc. 39-3 at PageID 1493.)[4] Reeves was not aware of any preceptor supervising two students at the same time. (Reeves Dep. Vol. II, Doc. 33 at PageID 737.)

Reeves worked four shifts with Nurse Saunders beginning on April 19 for a total of approximately forty hours. (Doc. 32-1 at PageID 512.) Despite the fact that Nurse Saunders had agreed to serve as Reeves's preceptor, he states that she told him that serving as his preceptor was "throwing her under the bus." (Doc. 39-1 at PageID 1472.) Reeves made journal entries for each of his preceptorship shifts, and he did not complain about race discrimination in the journal. (Reeves Dep., Doc. 32 at PageID 311.) On that first day, Nurse Saunders permitted Plaintiff to check the placement of a patient's nasogastric "NG" tube, administer feeding through the tube, and perform other skills that he had only done in a lab. On April 22, 2016, Saunders allowed Plaintiff to perform turn schedules for the prevention of pressure ulcers, to perform towel rolls for comfort, and to provide a nutritional instruction to a patient.

On April 25, 2016, a patient lodged a complaint against Reeves asserting that she "had to remind him to clean her finger before doing the finger stick blood sugar [test] and also to clean her skin before giving her insulin." (Doc. 32-1 at PageID 485.) The patient requested that Reeves not enter her room without Nurse Saunders's supervision. (*Id.*) Reeves responded in his Affidavit to the allegation by stating that Nurse Saunders was supervising him when he did the finger stick and that she failed to provide him with an alcohol wipe to clean the patient's finger.

---

[4] The written policy was consistent with the applicable Ohio regulation stating that "[a] preceptor shall provide supervision to no more than two nursing students at any one time, provided the circumstances are such that the preceptor can adequately supervise the practice of both students." Ohio Admin. Code § 4723-5-20(G).

(Doc. 39-1 at PageID 1480.)  Reeves stated in his daily journal required for the preceptorship that on April 25 he "obtain[ed] vital sings [*sic*] on four patients and measure[ed] glucose levels on two."  (Doc. 39-8 at PageID 1508.)

Nurse Saunders sent Professor Jackson text messages that day expressing her concern about Reeves's performance in the preceptorship.  She described him as "clueless[,]"  stated that he needed to be "reminded to use alcohol before any injections or finger stick[,]" and stated that he "still can't successfully take s [*sic*] full set of vitals."  (Doc. 35-3 at PageID 1220–25.) Professor Jackson recommended sending Reeves home for the day so that she, Dr. Sherman, and Nurse Saunders could meet to determine how to proceed.  (*Id.*)[5]

Reeves did one final preceptorship day at the Medical Center on April 26, 2016.  On that day, Nurse Saunders corrected Reeves for failing to report immediately that a patient had a low oxygen level vital sign.  (Doc. 32-1 at 477–78, 483.)  Reeves explained the incident by stating that he had observed that the patient was stable when he took the vital signs, that the vital signs machine was not working properly, and that he was focused only on obtaining the patient's temperature because the vital sign machine originally had failed to record it.  (Reeves Dep., Doc. 32 at PageID 286–87.)

On April 27, 2016, Nurse Saunders completed a Student Clinical Evaluation for Reeves. She rated him as "unsatisfactory" in multiple categories including the ability to provide "safe, competent care holistic nursing grounded in evidence-based practice[;]" the ability to administer intravenous, intramuscular, and subcutaneous medication; and the ability to provide a "safe environment for individuals and families."  (Doc. 32-1at PageID 475–77.)  In written comments, Nurse Saunders criticized Reeves for requiring instructions to complete vital signs, for needing

[5]  Professor Jackson did not specifically address these text messages in her Affidavit.  (Doc. 39-13.)  She stated that she had not received any negative feedback from Nurse Saunders or Nurse Wright prior to the day before his dismissal from the program.  (*Id.* at PageID 1529.)

reminders to clean skin with alcohol pads before injections, and for the inability to complete vital signs and finger sticks in a timely manner. (*Id.* at PageID 477.) She specifically noted that it took Reeves "two hours to complete vital signs and finger sticks on two patients." (*Id.*)[6] She stated that because of Reeves's failures in these tasks, he had been unable to complete other tasks required for the preceptorship including administering oral medication, collecting patient medical history, and accessing a patient's chart. (*Id*. at PageID 478.) She also stated that Reeves's failure to report the patient's low oxygen level on April 26 could have resulted in serious complications for the patient. (*Id.* at PageID 477.) She concluded that she could not pass him for the preceptorship experience because he was "not competent to complete basic nursing skills and patient safety is at risk when [he was] providing care." (*Id.* at PageID 478.)

Also on April 27, a clinical assistant named Betty Ewing wrote up Reeves for failing to use the proper procedure to listen to a patient's lung or bowel sounds on an unspecified date. (*Id.* at PageID 484.)

Dr. Denning and Dr. Sherman met with Reeves on April 28, 2016. Reeves was provided with the negative Student Clinical Practice Evaluation forms completed by Nurse Wright and Nurse Saunders and then dismissed from the Nursing Program. Professor Jackson did not support the decision to dismiss Reeves. (Jackson Aff., Doc. 39-13 at PageID 1529.) Dr. Denning informed Reeves in a written letter dated May 13, 2016 that he was not eligible for readmission into the Nursing Program because he had been previously dismissed and readmitted into the program. (Doc. 32-1 at PageID 500.) Dr. Denning averred that he also told Reeves that

---

[6] Nurse Saunders wrote that it took Reeves two hours to complete the vital signs and finger sticks on *Monday, April 2, 2016*, more than two weeks before Reeves was assigned to a preceptorship with Nurse Saunders. (*Id.*) This appears to be a typographical error. April 25, 2016 was a Monday. Reeves noted in his journal that day that he completed vital signs and finger sticks.

he could consider a licensed practical nurse ("LPN") program if he was interested in pursuing a nursing career. (Denning Aff., Doc. 34-3 at PageID 1178.)

Reeves appealed his dismissal to Paul Madden, Dean of the University's College of Professional Studies. He submitted a five-page, typed letter to Dr. Madden as part of his appeal in which he complained that he was treated unjustly, unethically, and with contempt, and was subjected to false accusations during his clinical preceptorship. (Doc. 32-1 at PageID 672–77.) Reeves did not assert that he was subjected to racial discrimination in the letter.

Dr. Madden upheld the dismissal in an email dated May 17, 2016 stating in part as follows:

> You did not satisfactorily complete the clinical portion of ADN2284 resulting in a failure in that course (Nursing Handbook, p.23) and you had previously failed another Nursing course requiring the use of your one-time readmission appeal (p. 50). Since the reason for your failure of ADN2284 was performance-based ("safe to practice") in the clinical setting resulting in your early removal from the clinical placement, I see no basis upon which to seek a waiver of the one-time re-admission policy (p. 50) of the department.

(*Id.* at PageID 499.) Dr. Madden also suggested that Reeves consider the LPN to RN route to nursing licensure. (*Id.*) Finally, he informed Reeves that he had the right to a further appeal to Jeffrey Bauer, the University Provost. (*Id.*) Reeves made the appeal to the Provost, but his dismissal from the Nursing Program was upheld.

## B. Procedural Posture

Reeves filed his Complaint against the Shawnee State Defendants and the SOMC Defendants on July 21, 2016. He asserted six claims for relief:

(1) Denial of equal protection against all Defendants;

(2) Race discrimination in violation of 42 U.S.C. § 1981 against all Defendants;

(3) Race discrimination in violation of 42 U.S.C. § 1983 against the University, the Medical Center, and Dr. Sherman;

(4) Discrimination by recipient of federal funds in violation of 42 U.S.C. § 2000d against the University;

(5) Discrimination in violation of Ohio Revised Code Chapter 4112 against all Defendants; and

(6) Intentional infliction of emotional distress against all Defendants.

(Doc. 1 at PageID 7–16.)  He asserted the claims against Dr. Sherman, Dr. Denning, Nurse Saunders, and Nurse Wright in both their official and individual capacities.  (*Id.* at 5–6.)  The Shawnee State Defendants filed an Answer denying liability on September 19, 2016.  (Doc. 4.)  The SOMC Defendants filed their Joint Answer denying liability the next day.  (Doc. 6.)

The Shawnee State Defendants filed a Motion for Judgment on the Pleadings on October 27, 2016.  (Doc. 11.)  The Court determined in an Order dated March 2, 2017 that the following claims could proceed against the Shawnee State Defendants:

A. First and Third Claims (42 U.S.C. § 1983 claims for equal protection and race discrimination):

1. The official capacity claims against Dr. Denning and Dr. Sherman for injunctive relief.

2. The individual capacity claims against Dr. Denning and Dr. Sherman for money damages to the extent that Reeves has alleged they personally engaged in discriminatory conduct.

B. Second Claim (42 U.S.C. § 1981 for race discrimination): The official capacity claims against Dr. Denning and Dr. Sherman for injunctive relief.

C. Fourth Claim (Title VI for race discrimination): The claim against the University.

(Doc. 16 at PageID 134.)[7]  All claims pleaded against the Medical Center, Nurse Wright, and Nurse Saunders proceeded forward because the SOMC Defendants did not move for dismissal.

All Defendants now have moved for summary judgment.  The summary judgment motions are fully briefed and ripe for adjudication.

---

[7]  The Court has assumed that Reeves intended to state the § 1983 race discrimination claim against Dr. Denning because that claim is co-extensive with the equal protection claim.  (Doc. 16 at PageID 121.)

## II.      LEGAL STANDARDS ON MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*).  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted).  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at

248.  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

## III.    ANALYSIS

### A.    Claims against the Shawnee State Defendants

#### 1.    Official Capacity Claims and Claims against the University

Reeves asserts claims for a violation of equal protection and for race discrimination pursuant to 42 U.S.C. § 1983 against Dr. Denning and Dr. Sherman in their official capacities; for race discrimination in violation of 42 U.S.C. § 1981 against Dr. Denning and Dr. Sherman in their official capacities; and for race discrimination in violation of Title VI, 42 U.S.C. §2000d against the University only.  Suits for injunctive and declaratory relief against state university officials acting in their official capacities are permitted when the plaintiff seeks prospective injunctive relief.  *Doe v. Cummins*, 662 F. App'x 437, 443–44 (6th Cir. 2016).

42 U.S.C. § 1983 creates a private cause of action for violations of constitutional rights committed by a "person" acting under the color of state law.  The equal protection claim and the race discrimination claims are co-extensive.  *See Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (stating that Title VI prohibits racial classifications that would violate the Equal Protection Clause); *Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005) (citation omitted) ("To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class.").  42 U.S.C. § 1981 "prohibit[s] racial discrimination in the making and enforcement of contracts."  *McCormick v. Miami Univ.*, 693 F.3d 654, 659 (6th Cir. 2012).  Ohio law treats the relationship between a university and its students as contractual in nature.  *Al-Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355, 359 (6th Cir. 2015).  Finally, Title VI states

that "[n]o person in the United States shall, on the ground of race, color, or national origin, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

Intentional discrimination can be proven by either direct evidence or by indirect evidence

using the *McDonnell Douglas* burden-shifting scheme. *See Amini v. Oberlin College*, 440 F.3d

350, 358 (6th Cir. 2006) (Title VI case). Reeves presents no admissible direct evidence of

discrimination against him by the Shawnee State Defendants.[8] Under the indirect evidence proof

scheme, Reeves has presented evidence sufficient for a reasonable factfinder to conclude that he

is African-American, that he was otherwise qualified for the Nursing Program, and that he

suffered an adverse action when he was dismissed from the Nursing Program. The primary

contested issue is whether Reeves has presented evidence that he was treated worse than a

similarly-situated person outside his protected class. *Cf. Ryan v. City of Detroit, Mich.*, 698 F.

App'x 272, 279 (6th Cir. 2017) (stating that "the threshold question" of an equal protection claim

is "whether the defendant has treated similarly situated persons disparately"). Similarly-situated

persons must be similar in "relevant" and "material" respects, but they need not be identical in

all respects. *Id.*

In another case involving dismissal from a medical-related education program, the district

court stated that the similarly-situated student would have had to generate similar concern among

faculty members about their practical ability and clinical work. *Zwick v. Regents of Univ. of

Mich.*, No. 06-12639, 2008 WL 1902031, at *8 (E.D. Mich. Apr. 28, 2008), *reconsideration

denied* 2008 WL 11356797 (June 9, 2008). The academic judgment of university officials about

---

[8]  Reeves asserts that a nursing student told him that the she had heard from someone else that Nurse Saunders made a derogatory, race-tinged comment about Reeves's anatomy. (Reeves Dep., Doc. 32 at PageID 258.) This hearsay is inadmissible. Moreover, Reeves has no evidence that a University decisionmaker was aware of the alleged comment or was influenced by it.

whether a student has "the necessary clinical ability to perform adequately as a medical [professional] . . . is by its nature more subjective and evaluative" than a typical disciplinary decision. *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978). Generally, a court can substitute its judgment for a university's academic judgment about a student only if it was arbitrary and capricious. *Al-Dabagh*, 777 F.3d at 359. The subjective nature of the judgment must inform the similarly-situated comparators analysis.

To satisfy the similarly-situated comparator element, Reeves first offers the affidavit statements of three classmates in the nursing program. Theressa Mangus stated that Reeves performed better in a Level 3 Maternity class than she did. (Doc. 39-14 at PageID 1536.) Jessica Lute stated that Reeves's grades were better than hers "[m]uch of the time." (Doc. 39-16 at PageID 1541.) Lute also asserted that Nurse Saunders had treated Reeves differently than white students in a Level 3 clinical course that she taught by refusing to answer Reeves's questions. (*Id.* at PageID 1542.) However, Reeves has not established that his performance in his Level 3 courses, nor his overall grades, were relevant to the University's decision to dismiss him from the Nursing Program. Neither Mangus nor Lute asserted that any white student failed one academic class and then was evaluated as performing poorly in his or her Level 4 preceptorship rendering the student unsafe to practice nursing.

The third nursing student, Jennifer Kyle, stated that all students in the ADNR 2284 lab performed the "Code Blue Simulation Scenario" poorly, but that only Reeves did not pass. (Doc. 39-15 at PageID 1538.) The relevance of the Code Blue Simulation Scenario to Reeves's dismissal from the Nursing Program is not clear. Reeves was dismissed from the Nursing Program for failing the clinical preceptorship aspect of ADRN 2284. (Doc. 32-1 at PageID 499.) The Court has seen no evidence that Reeves's performance in the Code Blue Simulation

Scenario factored into his dismissal.  As such, Kyle's statement does not establish that the other students are relevant comparators.

Reeves also stated that Professor Jackson identified incidents in which similarly-situated white students were treated better than he was treated.  First, Professor Jackson asserted that a white student who struggled putting on sterile gloves was given the opportunity to practice the skill and get better.  (Doc. 39-13 at PageID 1527.)  However, Professor Jackson did not provide enough specific facts about this student's situation to make her a relevant comparator.  Professor Jackson does not state if the student struggled in a Level 1, 2, 3, or 4 class.  She did not state if the student struggled in a laboratory practice setting or in a real-world preceptorship.  She does not state if the student's difficulty in performing the task affected patient care.  Without such information, the Court cannot conclude that the white student was similarly situated to Reeves.  *See Bell v. Ohio State Univ.*, 351 F.3d 240, 253–54 (6th Cir. 2003) (stating that the plaintiff did not establish that a student was a comparator when the plaintiff did not know facts about the student's name, race, or the clinical rotation for which the student had been permitted to take a make-up examination); *see also Derusha v. Detroit Jewish News & Style Magazine*, 132 F. App'x 629, 631 (6th Cir. 2005) (stating that plaintiff's unsupported opinion that a manager of a different religion was treated better despite having a poorer performance is not sufficient at summary judgment stage).  Also, the evidence shows that Reeves himself was given assistance to master the basis nursing task of properly inserting IV lines during the Fall 2013 semester.

Professor Jackson averred that the University "had a white student who received a grade of 'F' in another faculty member's course[,]" but "was not dismissed from the program."  (Doc. 39-13 at PageID 1530.)  She also stated that Dr. Denning intervened on behalf of unnamed white students who were on track to fail nursing courses, instructing faculty members not to fail the

students, because Dr. Denning did not want them to be dismissed from the Nursing Program. (Doc. 39-13 at PageID 1530–31.) Again, these statements by Professor Jackson lack the specificity required to be probative evidence at the summary judgment stage that Reeves was treated differently because of his race. The following quote from the *Bell* case about an alleged medical student comparator is instructive:

> When asked whether she knew of any student who had been allowed to take makeup exams in any other clinical rotation, she said that she knew of such a student but could not recall the student's name, the clinical rotation at issue, or any other specific detail about the student or the rotation. Significantly, she did not remember whether this unidentified student was a member of a minority race, although she thought the student was male. In short, we have read Ms. Bell's deposition and we conclude that it contains no information whatsoever in support of her claim that she was treated differently from similarly situated medical students on the basis of her race, her gender or any other characteristic.

*Bell*, 351 F.3d at 253–54. Likewise, Professor Jackson did not state here that any of the white students passed due to Dr. Denning's intervention were going to fail the Level 4 course, ADNR 2284, because of poor performance during their preceptorship. Professor Jackson does not state that any of the unnamed white students were found to have put patient safety at risk. The Nursing Program policy quoted earlier expressly stated that a student's unsatisfactory performance in a clinical area would result in a failing grade even if the student's theory coursework was acceptable. The Court cannot conclude that the Shawnee State Defendants treated these students differently based on their race without information establishing they were similar in relevant respects to Reeves.

Next, Reeves criticizes the system Dr. Sherman used to determine which students were assigned preceptorships first was biased against him. He relies on Professor Jackson's statements that the system based on the students' score on a medical dosage calculation quiz was "contrary to basic educators' standards" and put "'at risk' students at a disadvantage as it kept them out of the clinical setting for a longer period of time." (Doc. 39-13 at 1532.) Whether or

not these criticisms of Dr. Sherman's system are valid, they do not establish that the system was anything other than race neutral.[9] Professor Jackson implicitly agreed the system was race neutral when she stated that Reeves's preceptorship "was poorly scheduled in comparison to *most* other students." (*Id.* (emphasis added).) *All* of the other students were white, according to Reeves. Therefore, if he was scheduled poorly in comparison to only *most* other students, then he was scheduled fairly in comparison to *at least some* other students, students who had to be white. Professor Jackson's statement on this point is consistent with Dr. Sherman's statement that two other white students began their ADNR 2284 preceptorships at approximately the same time as Reeves. At least one other student, Student H, necessarily a white student if Reeves was the only black student in his nursing class, required an extension beyond the scheduled graduation date to finish his preceptorship. Also, Reeves did not accept opportunities to do his preceptorship earlier in the semester at King's Daughters Medical Center despite Dr. Sherman's warnings about the risk of starting preceptorships late in the semester.

Lastly, Reeves alleges that Dr. Sherman knew Nurse Wright was going on vacation during the term of the scheduled preceptorship when she assigned Nurse Wright to be Reeves's first preceptor. However, Reeves does not provide facts to support his allegation. The Court cannot assume that Reeves has a factual basis to state what another person knows without evidence. Moreover, Reeves testified at his deposition that he told Dr. Sherman about Nurse Wright's vacation the first day of his preceptorship:

A. Yes. Being in my situation, it was known long before my preceptor was going on vacation that she would be leaving.

Q. Who knew that she was going on vacation?

---

[9] The Shawnee State Defendants argue that the students who performed more poorly on the dosage calculation quiz could have used the time before their preceptorships began to sharpen their clinical skills in the practice labs.

A.  I knew.  She told me the first day.  I told Christy [Sherman].  I also told my clinical facilitator.

(Doc. 32 at PageID 376–77.)  In sum, the criticism of the preceptorship scheduling process does not establish race discrimination against Reeves.

Reeves asserts a host of other complaints about how he was treated during his preceptorship, but the complaints do not individually or collectively support a prima facie case of discrimination against the Shawnee State Defendants.  He complains that the University would not let him begin his preceptorship with Nurse Saunders while she was serving for a preceptor for another student, despite the written policy stating that a preceptor could supervise two nursing students if the circumstances allowed.  However, Reeves does not refute Dr. Sherman's testimony that she did not allow any two nursing students, black or white, to be supervised by the same preceptor at one time.

He also complains that the Shawnee State Defendants relied upon unfair and inaccurate preceptorship evaluations by Nurse Wright and Nurse Saunders, but does not support these arguments with sufficient evidence to raise material disputes of fact.  For instance, he asserts Nurse Saunders failed to provide him with an alcohol wipe when he gave a patient a finger stick blood sugar test.  However, he does not dispute the patient's second complaint about him that he failed to clean her skin before giving her insulin.  Similarly, he states that machine error caused a patient's low oxygen level vital sign, but does not dispute that he failed to report the vital sign reading to Nurse Saunders.  He also fails to challenge altogether the clinical aid's complaint that he improperly listened to a patient's bowel sounds while asking the patient to take deep breaths.  Finally, he complains that Nurse Saunders did not permit him to perform certain tasks and that she let a white nursing student attempt to perform one of those tasks.  However, this allegation lacks factual specifics to be probative of discrimination.  He does not identify which tasks he

21

wanted to perform, except for "pulling and scanning medications" and shift reports, he does not provide the name or skill level of the white students allowed to perform the tasks, and he does not provide evidence that he was qualified to perform the tasks. (Doc. 39-1 at PageID 1473–74, 1479.)

Finally, to the extent that Reeves alleges that the Shawnee State Defendants were deliberately indifferent to his complaints about race discrimination, those claims fail as a matter of law. Reeves admits that he did not explicitly complain that he was treated unfairly or differently *based on his race* to Dr. Denning, Dr. Sherman, or Dr. Madden. Reeves identifies no case law stating that it is sufficient for him to have complained about unfair treatment, without mentioning race, because he purports to be the only black nursing student. Also, Reeves admits that Dr. Denning assisted him when he complained about unfair treatment by Dr. Selby during the Spring 2015 semester and helped him practice inserting IV lines during the Fall 2015 semester.

In conclusion, Reeves lacks direct evidence of unequal treatment based on race or race discrimination. He also lacks evidence that similarly-situated white nursing students were treated more favorably than he was in material respect as would be necessary to establish a prima facie case of race discrimination under the *McDonnell Douglas* standard. The Court will grant summary judgment to the University and to Dr. Denning and Dr. Sherman on the official capacity claims against them.

### 2. Personal Capacity Claims against Dr. Denning and Dr. Sherman

Reeves also alleges equal protection and race discrimination claims against Dr. Denning and Dr. Sherman in their personal capacities. The claims fail as a matter of law. The doctrine of qualified immunity provides "that government officials performing discretionary functions

generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether qualified immunity applies, courts must ask whether the government official's conduct violated a constitutional right, and if yes, whether the specific right violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court already has determined that Reeves has not presented sufficient evidence for a jury to conclude that he was discriminated against on the basis of race by the Shawnee State Defendants. Thus, Dr. Denning and Dr. Sherman are entitled to qualified immunity. The Court will grant summary judgment to them on the personal capacity claims.

**B.      Claims against the SOMC Defendants**

Reeves asserts claims for violation of equal protection pursuant to 42 U.S.C. § 1983, race discrimination in violation of 42 U.S.C. § 1981, race discrimination in violation of Ohio law, and intentional infliction of emotional distress against the Medical Center, Nurse Wright, and Nurse Saunders. He also asserts a claim for race discrimination in violation of 42 U.S.C § 1983 against the Medical Center.

The SOMC Defendants first move for summary judgment on the equal protection and the race discrimination claims on the basis that they did not act under the color of state law. A private individual or entity acting on its own cannot deprive a citizen of his constitutional rights. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936–37 (1982); *see also Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000). However, under § 1983, a private party's actions may constitute state action when those actions are "fairly attributable to the state." *Lugar*, 457 U.S. at

937.  There are three accepted tests for determining whether private action is fairly attributable to the state: (1) the symbiotic relationship or nexus test; (2) the public function test; and (3) the state compulsion test.  *See Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003); *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003) (*en banc*).  Both parties agree that the relevant test here is the symbiotic relationship or nexus test.  An entity acts "under color of state law" if there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  *Minges v. Butler Cty. Agr. Soc.*, 585 F. App'x 879, 880 (6th Cir. 2014) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Asn'n*, 531 U.S. 288, 295 (2001).)  "[T]he ties between the private party and the state must be substantial."  *Siskaninetz v. Wright State Univ.*, 175 F. Supp. 2d 1018, 1023 (S.D. Ohio 2001).

In *Siskaninentz*, Chief Judge Walter Rice of the Southern District of Ohio determined that a nurse employed by a private medical center, but serving as the preceptor for a Wright State University nursing student, was not a state actor for purposes of § 1983.  175 F. Supp. 2d at 1024–25.  Chief Judge Rice's analysis in *Siskaninentz* applies equally to this case:

> Siskaninetz argues that [Nurse] Van Dyne "entangled" herself with Wright State University, so that her actions as a preceptor are attributable to the state, in several ways.  First, she contends that Wright State University benefitted from having its students gain clinical experience, and Van Dyne (as well as Franciscan) benefitted from the unpaid services of the students.  Second, she contends that Van Dyne's entanglement with Wright State University was long-term, as she had served as a preceptor for seven years. Third, Siskaninetz contends that Wright State University delegated its responsibility for observation and evaluation of its students to Van Dyne, who, alone, evaluated their performance in practicums.  Fourth, Siskaninetz contends that Van Dyne functions as a de facto Wright State University faculty member.  In particular, she reasons that Van Dyne evaluated her performance and passed that information on to Stevenson, who merely performed the ministerial task of assigning a grade based on information supplied by Van Dyne.  Finally, she restates her earlier arguments, insisting that "even though Stevenson completed a written evaluation of [her] performance in Nursing 424 and assigned a failing grade, Stevenson did so based solely on information

provided by Van Dyne." Indeed, Siskaninetz stresses that "[w]ithout Van Dyne, there would have been no information upon which to base any grade in the clinical part of Nursing 424." (Doc. # 29 at 17–20).

Upon review, the Court concludes, as a matter of law, that Van Dyne *was not* acting "under color of state law," when she served as Siskaninetz's preceptor. Despite the Plaintiff's arguments to the contrary, the evidence does not reveal a genuine issue of material fact. As a threshold matter, the Court notes that this case presents an atypical state action issue. In the usual case, "a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action." *Tarkanian*, 488 U.S. at 192, 109 S.Ct. 454. In the present case, however, the decisive act that allegedly deprived Siskaninetz of her constitutional rights was taken by Wright State University, when it dismissed her from the College of Nursing and Health. The Court harbors no doubt that Wright State University acted under color of state law, within the meaning of § 1983, when it dismissed Siskaninetz. With regard to Van Dyne, however, the relevant inquiry *is not* whether Wright State University was excessively involved in Van Dyne's activities, thereby rendering her otherwise private conduct state action. Rather, the critical question is whether the University's decision to dismiss Siskaninetz, a decision influenced by Van Dyne's evaluation, converted her conduct into state action. When confronting this atypical state action issue, the Court must "proceed cautiously in applying the nexus test, adhering to the rule that a mere relationship between the state and [a] private [party] is insufficient to impose liability on the private [party]." *Austin v. Diaz*, 194 F.3d 1311, 1999 WL 970313 (6th Cir. Oct.13, 1999) (unreported).

Having reviewed the evidence and pertinent case law, the Court concludes that any reliance by Wright State University and/or Stevenson on Van Dyne's evaluation of Siskaninetz did not transform that evaluation into state action for purposes of § 1983. . . .

[I]n the present case, Wright State University was not compelled to accept Van Dyne's evaluation of Siskaninetz or to discharge her from its nursing program based on that evaluation. Van Dyne, a preceptor at a private hospital, simply provided the University with information, which it was free to use as it desired. The fact that the University elected to act on that information, and to dismiss Siskaninetz, does not transform Van Dyne into a state actor for purposes of § 1983.

*Id.* (emphasis omitted); *see also Kelly v. Forest Hills Loc. Sch. Dist. Bd. of Educ.*, 19 F. Supp. 2d 797, 802 (S.D. Ohio 1998) (finding that the private school supervisor of a public school employee assigned to provide auxiliary services to the private school was not a state actor when he made performance evaluations relied upon by the public school district).

Reeves makes only a conclusory argument that the SOMC Defendants are state actors for purposes of § 1983. (Doc. 41 at PageID 1581.) He identifies *Siskaninetz* as relevant authority, but does not undertake to distinguish the holdings of *Siskaninetz* or *Kelly*. He only baldly asserts that the Medical Center "is clearly a part of the educational program offered by Shawnee State University" and the Medical Center "is instrumental in providing the rules and standards required in the Level 4 [ANDR 2284] course." (*Id.*) These statements are not supported by the evidence. The University utilizes up to three private medical facilities for its nursing preceptorships, not only the Medical Center. The University creates the syllabus for the ADNR 2284 course of which the preceptorship is one part. (Doc. 32-1 at PageID 606–25.) Professor Jackson created the form the University used to track the progress of each student during their preceptorships. Reeves has failed to establish as a matter of law that the decision of the Shawnee State Defendants to dismiss Reeves from the Nursing Program based on negative evaluations provided by Nurse Wright and Nurse Saunders converted their conduct into state action. Therefore, the SOMC Defendants cannot be liable as state actors pursuant to 42 U.S.C. § 1983.

Next, Reeves asserts that the SOMC Defendants discriminated against him in violation of the Ohio Revised Code § 4112.02. Ohio Revised Code § 4112.02(A) generally prohibits discrimination by employers in regards to the terms and conditions of employment. The SOMC Defendants move for summary judgment on the grounds that there is no employment relationship between the parties as would be necessary to find liability under this statute. The Court agrees. The preceptorship was part of the Nursing Program offered by the University to nursing students. The University, not the Medical Center, set the broad parameters of the preceptorship as set forth in the Preceptor Policy. Nurse Wright and Nurse Saunders were not paid wages or a salary to serve as preceptors, and nursing students such as Reeves were not paid

a salary or benefits by the Medical Center for their preceptorship hours. The preceptorship was intended to last only 120 hours over the course of approximately one month. These factors do not suggest an employment relationship. Reeves has not identified specific factors backed by evidence to support his contention that the preceptorship was akin to an employment relationship. *See Shah v. Deaconess Hosp.*, 355 F.3d 496, 499–500 (6th Cir. 2004) (setting forth a common law test of employment with factors including who controls the manner and means of work, the method of payment, and the duration of the relationship). In sum, Reeves has failed to establish that an employment relationship existed such that the SOMC Defendants could be held liable for discrimination under Ohio Revised Code § 4112.02(A).

Relatedly, Reeves makes a passing argument in his Memorandum Contra that the Medical Center can be held liable as a place of public accommodation under Ohio Revised Code § 4112.02(G). However, the Complaint cannot be read to fairly state a claim for public accommodation discrimination. The public accommodation prohibition states as follows:

> It shall be an unlawful discriminatory practice:
>
> * * * *
>
> (G) For any proprietor or any employee, keeper, or manager of a place of public accommodation to deny to any person, except for reasons applicable alike to all persons regardless of race, color, religion, sex, military status, national origin, disability, age, or ancestry, the full enjoyment of the accommodations, advantages, facilities, or privileges of the place of public accommodation.

Ohio Rev. Code § 4112.02(G). The Ohio Supreme Court has stated that the test for unlawful discrimination under this section "is simply whether the proprietor, keeper, manager or employee of a place of public accommodation has denied to any person the full enjoyment of such place for reasons not applicable alike to all persons, irrespective of race, color, religion, national origin or ancestry." *Ohio Civil Rights Comm'n v. Lysyj*, 38 Ohio St. 2d 217, 313 N.E.2d 3, 6 (1974). "Full enjoyment" of a place of public accommodation means "the right to purchase all services

or products of a place of public accommodation, the right to be admitted to any place of public accommodation, and the right to have access to the services and products of such a place in the same manner as all other customers." *Meyers v. Hot Bagels Factory, Inc.*, 131 Ohio App. 3d 82, 721 N.E.2d 1068, 1083 (1999).

Reeves alleges in the Complaint that he was discriminated against during the clinical training he received at the Medical Center as part of his nursing student preceptorship through the University. Reeves did not allege in the Complaint that he was denied admittance to the Medical Center or the right to access the medical services of the Medical Center in the same manner of other customers. It would be unfair and prejudicial to Defendants to allow Reeves to assert a public accommodation discrimination claim at this late stage of the case.

Reeves also alleges that the SOMC Defendants discriminated against him in the enforcement of a contract in violation of 42 U.S.C. § 1981. The SOMC Defendants assert that they are entitled to summary judgment on this claim because they did not have a contractual relationship with him. In rebuttal, Reeves cites to the Clinical Preceptor Agreements signed by Reeves and the University on one side and Nurse Wright and Nurse Saunders, respectively, on the other side. (Doc. 32-1 at PageID 641–42.) In their respective Clinical Preceptor Agreements, Nurse Wright and Nurse Saunders signed their agreement to the following statements:

> I [Preceptor Name] agree to serve as the Clinical Preceptor for Cory Reeves for the time period from [Date] to [Date] for approximately [##] weeks/semester.
> I understand the responsibilities of the Clinical Preceptor and agree to carry them out.
> I understand this is an unpaid non-tenured position.
> I have completed the required preceptor orientation.
> _____ (Preceptor Signature)

(*Id.*) The Court agrees with the SOMC Defendants that the Clinical Preceptor Agreements are not enforceable contracts between Reeves and Nurse Wright or Nurse Saunders, respectively.

However, the Court will assume for the purposes of this Order that they are contracts between the University and Nurse Wright and Nurse Saunders, respectively, to which Reeves is an intended third-party beneficiary.[10]

Claims under § 1981 are analyzed under the Title VII standards. *See Newman v. Fed. Exp. Corp.*, 266 F.3d 401, 406 (6th Cir. 2001); *Perrea v. Cincinnati Pub. Schs.*, 709 F. Supp. 2d 628, 646 (S.D. Ohio 2010). Reeves's § 1981 claim fails on many of the same bases as his claims against the University Defendants failed so the analysis only will be summarized here. First, Reeves offers no admissible direct evidence of discrimination. As to indirect evidence, Reeves has not offered specific evidence sufficient for a reasonable jury to conclude that Nurse Wright or Nurse Saunders treated similarly-situated white nursing students better during their preceptorships.

To begin, Reeves disagrees with Nurse Wright's and Nurse Saunders's evaluations of his nursing skills. Reeves also makes conclusory assertions that he was not permitted the same opportunities as white students. However, he does not identify other students' names, educational backgrounds, or skill levels such that the Court or a factfinder could determine whether the other students were similarly situated to Reeves in relevant respects. Moreover, Reeves has not submitted proof that he was qualified to perform the nursing skills he was denied the opportunity to perform. A plaintiff cannot create a genuine dispute of material fact simply with his purely subjective opinions of his own skills and qualifications. *See*, *e.g.*, *Moore v.*

---

[10] Contracts require consideration. *Resource Title Agency, Inc. v. Morreale Real Estate Servs., Inc.*, 314 F. Supp. 2d 763, 769 (N.D. Ohio 2004) (citing *Kostelnick v. Helper*, 96 Ohio St. 3d 1, 3, 770 N.E.2d 58 (2002)). Consideration is the "bargained for legal benefit and/or detriment." *Id.* There is no consideration between Reeves with either Nurse Wright and Nurse Saunders. Nurse Wright and Nurse Saunders agreed to carry out "responsibilities of the Clinical Preceptor." The responsibilities of the preceptor are set forth in the University's Preceptor Policy. (Doc. 32-1 at PageID 627–28.) It states that the preceptor "is expected by Shawnee State University Department of Nursing" to accept twelve responsibilities. (*Id.*) The preceptor's responsibilities are owed to the University, not to the nursing students such as Reeves. In return, the University offers the preceptors "two contact hours of SSU Department of Nursing sponsored continued education offerings free of charge for each quarter of service." (*Id.* at PageID 627.)

*Abbott Labs.*, 780 F. Supp. 2d 600, 616 (S.D. Ohio 2011); *EEOC v. Memphis Goodwill Industs. Inc.*, 675 F. Supp. 2d 846, 851 (W.D. Tenn. 2009). The only medical professional to testify on Reeves's behalf, Professor Jackson, did not observe his performance during the clinical preceptorship, so she is not able to testify as to whether he rendered competent care to patients. Reeves has no objective evidence to dispute that he had difficulty checking vital signs or administering IVs, that he failed to clean a patient's skin before giving her insulin, or that he failed to report a patient's low oxygen level test result to Nurse Saunders.[11] In sum, he failed to create a genuine dispute of material fact that Nurse Wright or Nurse Saunders discriminated against him on the basis of his race.[12]

Finally, Reeves alleges a claim for intentional infliction of emotional distress against the SOMC Defendants. The Ohio Supreme Court recognized the tort of intentional infliction of serious emotional distress in *Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 453 N.E.2d 666, 670–71 (1983), *overruled on other grounds*, *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 866 N.E.2d 1051, 1054 (2007). The Sixth Circuit reduced the tort into these four elements: "(1) defendants intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress, (2) defendants' conduct was extreme and outrageous, (3) defendants' actions proximately caused plaintiff's emotional injury, and (4) plaintiff suffered serious emotional anguish." *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995) (citations omitted).

The Ohio Supreme Court articulated the essence of "extreme and outrageous" conduct as follows:

---

[11] As discussed earlier, although Reeves faulted Nurse Saunders for not giving him an alcohol wipe to clean a patient's skin before doing a finger stick blood sugar test, he does not refute that he failed to use the alcohol wipe before administering insulin.

[12] The § 1983 and § 4112.02 discrimination claims fail on this independent basis as well.

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Yeager*, 453 N.E.2d at 671 (quoting Restatement (Second) of Torts § 46(1) cmt. d (1965)).

Regarding the emotional injury element, the plaintiff's distress "must be so severe and debilitating that 'a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case.'"  *Santino v. Columbus Pub. Sch.*, 833 F. Supp. 2d 780, 801 (S.D. Ohio 2011) (quoting *Paugh v. Hanks*, 6 Ohio St. 3d 72, 78, 51 N.E.2d 759 (1983)).

Reeves offers only conclusory arguments in favor of this claim.  He does not cite to any case law wherein similar allegations that a student was dismissed from his academic program or subjected to unfair performance evaluations were found sufficient to state a claim for intentional infliction of emotional distress.  It is important to note that the Medical Center has presented unrefuted evidence that a patient made a complaint against Reeves and that Reeves admitted to failing to report the low oxygen level reading generated by a possibly faulty vital sign charting machine.  It is not outrageous as a matter of law for a nursing preceptor to report such incidents to a nursing student's faculty supervisor.  Moreover, Reeves has presented no facts that his dismissal from the nursing program resulted in severe or debilitating emotional distress.  The Court will grant summary judgment to the SOMC Defendants on the intentional infliction of emotional distress claim as a matter of law.

**IV.     CONCLUSION**

For the foregoing reasons, the Court will **GRANT** the Motion for Summary Judgment

(Doc. 34) filed by the Shawnee State Defendants and the Motion for Summary Judgment (Doc.

35) filed by the SOMC Defendants.

**IT IS SO ORDERED.**

Dated this 29th day of January, 2018.

BY THE COURT:

S/Susan J. Dlott
Susan J. Dlott
United States District Judge